## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 02 2017, 5:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Cindy L. Kenworthy
Cindy L. Kenworthy, P.C.
Indianapolis, Indiana

Thomas L. Landwerlen
Landwerlen & Rothkopf, L.L.P.
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Todd A. Bylsma, <br> *Appellant-Respondent,* <br><br> v. <br><br> Diana (Bylsma) Smith, <br> *Appellee-Petitioner* | May 2, 2017 <br><br> Court of Appeals Case No. <br> 74A01-1611-DR-2525 <br><br> Appeal from the Spencer Circuit Court <br><br> The Honorable Keith A. Meier, Special and Senior Judge <br><br> Trial Court Cause No. <br> 74C01-0704-DR-0149 |

**Baker, Judge.**

[1] Todd Bylsma (Father) appeals the trial court's order requiring that he pay a portion of his daughter's postsecondary educational expenses and denying his request that the trial court find Diana Smith (Mother) in contempt. Father raises three arguments on appeal: (1) the trial court erred by finding that his daughter, Robyn, did not repudiate Father; (2) the trial court erroneously calculated Father's income and Robyn's post-secondary educational expenses; and (3) the trial court erred by finding that Mother was not in contempt. Finding no error, we affirm.

## Facts

[2] Father and Mother were married in July 1994, and one child—Robyn—was born of the marriage on January 26, 1996. The marriage was dissolved in July 2007. The parents agreed to share joint custody, with Mother being the primary physical custodian and Father having parenting time according to the Indiana Parenting Time Guidelines. Father also agreed to pay child support in the amount of $500 per month.

[3] During Robyn's teenage years, her relationship with Father deteriorated dramatically. She graduated from high school in the spring of 2014 and enrolled in Purdue University in the fall of 2014.

[4] On July 9, 2014, Mother filed a petition for educational support, seeking a court order that Father contribute to Robyn's college education. On September 15, 2014, Father filed a petition seeking Mother found in contempt for her alleged failures to abide by the dissolution decree. On October 8, 2014, Father filed a

petition to modify the dissolution decree. The trial court held an evidentiary hearing on all pending motions on June 29, 2016, and on October 23, 2016, it entered an order granting Mother's petition and denying Father's contempt petition. Father now appeals.

# Discussion and Decision

At the outset, we note that Mother has not filed an appellee's brief in this matter. It is well established that our Court "will not undertake the burden of developing arguments for the appellee." *In re Adoption of N.W.R.*, 971 N.E.2d 110, 112 (Ind. Ct. App. 2012). Moreover, we apply "a less stringent standard of review" and "may reverse the trial court if the appellant establishes prima facie error," which is error "at first sight, on first appearance, or on the face of it." *Id.* at 113.

# I. Repudiation

Father first argues that the trial court erred by finding that Robyn has not repudiated her relationship with Father. A determination regarding repudiation is within the sound discretion of the trial court. *Koontz v. Scott*, 60 N.E.3d 1080, 1082-83 (Ind. Ct. App. 2016). We will reverse only if the trial court's order is against the logic and effect of the facts and circumstances before it or if the court has misinterpreted the law. *Id.* In conducting our review, we will consider only the evidence and reasonable inferences favorable to the judgment. *Id.*

This Court has recently explained the doctrine of repudiation:

There is no absolute legal duty on the part of parents to provide a college education for their children. In determining whether to order parents to pay sums toward their child's college education, the trial court must consider whether and to what extent the parents, if still married, would have contributed to college expenses. Where an adult child repudiates a parent, however, that parent must be allowed to dictate what effect the repudiation has on the parent's contribution to college expenses. Repudiation is defined as a "complete refusal" by the adult child to participate in a relationship with the parent. A finding regarding repudiation is particularly fact sensitive.

*Id.* at 183 (internal citations omitted).

[8] Here, the trial court entered an excellent, thorough, and detailed order explaining why it concluded that Robyn has not repudiated her relationship with Father. In relevant part, the court found as follows:

4. On October 9 and 13, 2012, when Robyn was 16 and a Junior in high school, Father send her duplicate emails asking if she wanted to go to her cousin, Katie's, wedding. . . . Later in October, a telephone conversation occurred between Robyn and Father which proved to be their last verbal communication. Although the evidence was somewhat confusing, it ostensibly involved Father telling Robyn he was not taking her to her cousin's wedding because she never confirmed with him (she did attend however but Father did not), that he was not taking her to his parents at Thanksgiving because he had had no contact with her and that Robyn had prioritized extracurricular activities over spending time with him. Whatever the content of the conversation, important to the Court's decision was that Father yelled at Robyn, she cried, and he hung up. There was no evidence Father has ever apologized for either yelling at her or hanging up on her.

\*\*\*

6.      Robyn testified at the hearing and, during cross-examination by Father's counsel, began crying when she was questioned about her cousin's wedding, the October 12, 2012 telephone call with Father and her depression during her Sophmore [sic] year in high school.

\*\*\*

8.      On December 19, 2012, Robyn initiated a conversation by email with Father asking "Are you going to be with the family on Christmas? I'll be at Grandma and Grandpa's all week." The next morning Father replied:

> Not this year. . . . Haven't gotten a response from any of my emails in the last few months, so didn't really plan on seeing you at Christmas and we have made plans for the week.
>
> I have been told, you don't want to talk to me because I am a horrible person. Why the sudden email at Christmas time?
>
> Maybe if you can respond to an email or two, I can try to see about having you stay here for a few days when we get the pool open. We will need to have a talk before you are able to stay here.
>
> Merry Christmas, Todd

9.      Robyn responded by email on December 20, 2012:

Why the sudden email at Christmas time? It's Christmas. The family never saw you on Thanksgiving. You never went to Katie's wedding. Grandma and Grandpa are trying, but they've been shut out. Last time we talked on the phone, I ended up in tears, and you hung up. I've felt like I've been walking on eggshells, but I sucked it up and asked you about Christmas because we're family, and that's what Christmas is for. If you have plans with Beth and Krista [Father's wife and stepdaughter], that's fine, but don't forget about the rest of your family. I haven't forgotten you; I'm just afraid of further confrontation.

10. Father responded on December 21, 2012 . . . :

. . . If I am as terrible to you as you told your grandma, let me know if you'd like me to leave you alone to avoid those eggshells. If that is your choice, don't worry, I've been in tears because of you too.

***

12. [In February 2013, Robyn invited Father to see her perform in *Les Miserables*] and instructed him on how to obtain tickets. His response that day, which the Court found curios [sic] was "Would you like for us to come and watch? Thanks, Todd Bylsma"

13. On June 16, 2013 Robyn emailed Father "Happy Father's Day!" There is no evidence of a response from Father.

14. . . . [O]n July 29, 2013, [Robyn sent her Father an email] telling him about her Alabama trip, how she has been busy, she was getting ready to attend her last band camp, she changed from marching trumpet to baritone, and she informed him of her SAT

and ACT scores that summer: 2090 and 32 respectively, punctuating the note with "WHOO!" and signing it "That's all for now. I miss you too." There was no evidence of a response from Father nor could he recall making a response, although the Court would have expected some congratulatory comment and/or expression of pride from Father.

\*\*\*

16.     [Robyn then invited Father to attend Senior Night and walk her down the field at a football game in October; he said he could not come. She also told him about other football games, at which she would be playing in the band, in October and November. There is no evidence he attended either game.]

17.     February 3, 2014, after Robyn turned 18 years of age, she sent an email to Father informing him of her lead role in the spring musical along with the show dates and time in March and stated "A lot of the family is coming to see it, and I would hope to see you there as well. Love, bye" He responded:

> Robyn,
>
> You have made the decision that you do not want me to be part of your life, and have communicated through my parents that you don't want to talk with you [sic] own father. I am confused on the invite to your play. I think that until we are able to somehow have a relationship where you can talk with me, then I don't know why this would matter to me. . . .

Father's statement if correct, that is, that she does not want to "talk" to him, did not suggest to the Court that she does not want to communicate nor that she was completely repudiating him,

but that she was more comfortable with written communication. Moreover, there is no evidence that he had attempted direct verbal communication with her prior to that time. The Court also felt he was not responding as it would expect a parent to respond.

18.     In her email response of February 4, 2014 Robyn told Father:

> I NEVER said that I didn't want to be a part of your life. I don't care what your secondary sources are, but you most certainly did not hear them from me.

> Think of this from my perspective. Two years ago, you told the grandparents, without asking me, that I would not be visiting for Thanksgiving because you didn't think I enjoyed myself at their house. They were hurt by this, but I emailed them and told them I still had every desire to see the family for the holiday. After they agreed to let me stay, you suddenly decided not to join the rest of us for Thanksgiving dinner. After that, you were absent for Christmas, Katie's wedding, Blake's wedding . . . . What message do you think that sent to me?

> If you're so hurt by this lack of communication, then you could make the effort to see the family again, at least for the holidays, because it's not just me who's missing out, it's everyone.

19.     Father responded about 3 hours later:

> . . . The lack of communication is with you, not my family. The wedge that was driven between my family and I was about you, and because of the things you were

saying to your Grandma.  This is why I missed all the family functions.  Your [sic] 18 now, so step up and take some responsibility for how you treat people, play them against each other, and your lack of respect or communication with my side of the family.  Your grandparents and I are well aware of how we got to this point, and how you got my own parents to turn on me, I have your emails to them.  We are clear about how we got to where we are and your name seems to come up. . . .

20.     Robyn responded 24 minutes later:

Whatever is between you and your parents is not my fault.  It's this kind of twisting of words that makes me so afraid to try to talk to you.

The invitation still stands.

There is no evidence that Father responded or attended the musical.

21.     Robyn emailed Father on February 11, 2014, stating "In case you were still considering the spring musical, the show has been moved to April 4-6."  He responded:

Thanks.  Probably not going to make the show, but let me know if you want to come spend some time together.  Would love to see you this summer.  Todd Bylsma

There is no evidence he took any initiative to set up a summer visit.  He placed the burden on her to do so.

22.	July 12, 2014, Robyn sent [an email to Father telling him Happy Birthday and inviting him to another show she was in later that summer.]

He responded the same day:

> Thanks. Probably not going to make the show, but let me know if you want to come spend some time together. Would love to see you this summer. Todd Bylsma

There is no evidence he took any initiative to set up a visit and again placed the burden on her to do so.

***

24.	On Tuesday, February 10, 2015, when Robyn was 19 years old and attending Purdue, [she sent an email to Father inviting him to three major performances she would be in that spring for the Purdue Symphonic Band.]

25.	Father responded on Friday February 13, 2015:

> It's great to hear from you, it's been awhile.

> Thank you for the invitation to your performances and I will let you know which one I will be at, but honestly I would much rather see you one on one in person. I miss seeing you. . . .

26.	There was no evidence . . . that Father actually attended any of the productions. This was also the last email communication from Father to Robyn.

***

29.     Father has not attempted to enforce parenting time since January 2008 because Robyn was engaged in a large number of activities she'd miss if she visited Father and he felt she'd resent him for exercising parenting time and he did not wish to become an irritant to her.

***

31.     Robyn invited Father to all events that mattered to her but he did not attend any of her high school activities in her junior or senior year including her high school graduation, although he received an invitation three (3) days prior, which he stated was too late.  Father testified he sent a graduation card but Robyn testified she did not receive the card.  Father desired to have one-on-one visits with Robyn, rather than attending events or shows that she was involved in and important to her.  However, he admitted that he never made any request for specific dates or times to meet and she did not reject any specific attempts by him at reconciliation.  Since Robyn's 18th birthday, Father has not contacted her regarding specific times to visit with her, notwithstanding that he stated it is not a child's responsibility to coordinate parenting time.  The evidence did not support a finding or conclusion that Robyn refused to visit with Father nor does the evidence support a finding or conclusion that Mother prevented parenting time.

***

34.     Robyn did not know Father's home address.

***

36.    . . . Robyn could not recall the last time she had seen Father prior to the trial date.

***

38.    There is no credible evidence Robyn has stated she does not wish to see Father (she testified she did), that she never wanted a relationship with him, that she does not respect Father, that she has repudiated his authority as her parent, that she has threatened him, that she has repeatedly and completely failed to respond to him when he contacts her, or considers their relationship ended.

39.    The evidence did not support a finding or conclusion that Father has considered his role in creating the current relationship with Robyn nor that he was accepting any responsibility for the status of that relationship.

40.    Because the trial was conducted in a small hearing room, rather than the courtroom, when Robyn testified at the hearing (which was in very close physical proximity to Father), the Court did not discern any evidence, in her eyes, words or actions, of hatred or even animous [sic] towards Father.

Conclusion(s):

1.    Father and Robyn clearly have a weak and, perhaps, strained relationship but the evidence did not support a finding or conclusion that Robyn has completely refused to participate in a relationship with Father or has completely repudiated the parent-child relationship with Father, either before or after she turned 18.

Discussion:

***

6.     The Court considered that Robyn might have feigned a relationship with Father in order to avoid a repudiation defense, but the Court would have expected a totally different tenor and content to her emails.  Having seen and heard Robyn testify and considering the evidence as a whole, the Court discounted that possibility. . . .  It appears that Robyn is afraid of confrontation with her Father. . . .  While Robyn is clearly intelligent, her emails suggest a typical teenage response, while Father appears to hold her to an adult standard and not with "open arms," relying instead upon her chronological age as being the criteria for adult maturity. . . .  The Court did not understand why Father did not do more to reach out to Robyn including attending her events, why he had not initiated telephone contact with her or took steps to obtain parenting time, other than to place the burden [on] Robyn to set it up. . . .  She appears to reach out to Father only to be met by his request that she do something more to further their relationship, indicating he wants the relationship to be on his terms.  His ending emails to Robyn with "Todd" or "Todd Bylsma" are not appropriate, could be considered as rude and send the wrong and inappropriate, if not confusing, message. The Court also sensed he was condescending. . . .  In sum, the Court felt Father's actions have been chiefly motivated by the specter of having to pay college expenses for Robyn, not manifesting a true desire to restore or further the Father-daughter relationship.

7.      . . . Other than emails, and perhaps some cards or email wishes, in every other way, it appeared that Father disappeared from Robyn's life.

8.      . . . However one characterizes the relation[ship], it is not repudiation and Father must share responsibility for the relationship.

9.      . . . The Court felt Father contributed to the status of the relationship with Robyn. The Court is convinced that Robyn has left open the possibility of rebuilding a relationship with Father. . . .

Appellant's App. p. 3-25 (internal citations and emphases omitted).

[9]    As noted above, repudiation must involve a complete refusal by an adult child to participate in a relationship with the parent. Here, the trial court examined the evidence in the record before it and reasonably concluded that Robyn has not, in fact, refused to participate in a relationship with Father. To the contrary, it appears that she made repeated attempts, both before and after she reached the age of eighteen, to engage and reengage in a relationship with him. He repeatedly declined her invitations to events in which she was participating and that held great importance for her. He made no attempts to call her or to engage in parenting time with her. He placed the full burden of maintaining the relationship on a teenager, which is unfair to his daughter regardless of her age. The trial court also had the benefit of observing the parties in person and based its conclusions, in part, on those in-person observations. We cannot and will not second-guess those assessments.

[10]   Father's arguments to the contrary merely amount to a request that we reweigh evidence and re-assess witness credibility—a request we decline. We find no error in the trial court's conclusion that Robyn has not repudiated her relationship with her Father and that he is, therefore, responsible for a portion of her post-secondary educational expenses.

## II. Calculation of Father's Income and Robyn's Expenses

[11] Post-secondary educational expenses are in the nature of child support. *Schacht v. Schacht*, 892 N.E.2d 1271, 1275 (Ind. Ct. App. 2008). We place a strong emphasis on trial court discretion in determining child support obligations. *Id.* A trial court's calculation of child support is presumptively valid, and we will reverse only if it is clearly erroneous or contrary to law. *Young v. Young*, 891 N.E.2d 1045, 1047 (Ind. 2008).

[12] First, Father argues that the trial court erred in the way it calculated his income for the purpose of apportioning post-secondary educational expenses. With respect to Father's income, the trial court found as follows:

> . . . His income, as reported on his federal income tax returns, was $95,169 in 2012 as an account manager, $107,321.78 in 2013, and $138,076.62 in 2014. In November 2014 Father started a business, GlassFire, Inc., with another individual wherein he is a shareholder. He serves as an IT Engineer. As a result of his entering into this business, his income dropped to $16,963 in 2015 but he is now earning $5,000.00 per month and expects that he will be able to sell his business in several years for $6,000,000.00. There is no evidence that Father was terminated from his prior employment, that he disliked it, that he could not have remained at this prior position, or that he considered, attempted, or is unable to obtain supplemental income after starting the new company. In computing his financial obligation, the Court chose to attribute his average income for 2012, 2013, 2014, plus his $60,000.00 projected income for 2016, all of which averages $100,141.85 per year or $1,925.80 per week.

Appellant's App. p. 27 (internal citation omitted).

[13] Indiana Child Support Guideline 3A(3) provides that "[i]f a court finds a parent is voluntarily unemployed or underemployed without just cause, child support shall be calculated based on a determination of potential income. A determination of potential income shall be made by determining employment potential and probable earnings level based on the obligor's work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community." The Commentary further states that "[o]bviously, a great deal of discretion will have to be used in this determination [of potential income]." Specific to post-secondary educational expenses, the Guideline 8(b) states that in calculating and apportioning such expenses, the trial court should "weigh the ability of each parent to contribute to payment of the expense . . . . [I]t should apportion the expenses between the parents and the child, taking into consideration the incomes and overall financial condition of the parents and the child . . . ."

[14] In this case, the trial court examined Father's income and employment history and made an implicit determination that, when he started his own business in November 2014, he became voluntarily unemployed. The trial court then examined Father's income history, current income, and future income potential in its calculation of his income for the purpose of apportioning the post-secondary educational expenses. In other words, the trial court took into consideration Father's income and overall financial condition, as suggested by the Guidelines. Given the wide latitude we give to trial courts with respect to

the calculation of a parent's income for these purposes, we find no error in the trial court's decisionmaking process regarding Father's income in this case.

[15]    Second, Father argues that the trial court's order leaves the door open to require him to pay towards Robyn's future educational expenses beyond her bachelor's degree. The trial court has authority and discretion to award post-secondary educational expenses and to determine the amount of such an award. *Warner v. Warner*, 725 N.E.2d 975, 978 (Ind. Ct. App. 2000). Father is correct that the term "postsecondary" does not include graduate school or other educational expenses beyond a bachelor's degree. *Allen v. Allen*, 54 N.E.3d 344, 349 (Ind. 2016).

[16]    Here, Father notes that Robyn testified that she needs 120 credits to graduate from Purdue and that, because she was an extremely successful high school student who entered the university with many credits already accumulated, she would accumulate her needed hours by the end of the fall 2016 semester. He complains that "Robyn's intention is to continue attending college classes until either Spring, 2018 . . . or Fall, 2018." Appellant's Br. p. 17. As Robyn explained, in addition to her physics major, she is also pursuing a minor in computer science. Therefore, to complete her chosen bachelor's degree, Robyn needs to accumulate more than 120 hours. The trial court's order requires Father to pay a portion of Robyn's undergraduate college and related expenses. At no point does it explicitly or implicitly require him to maintain financial responsibility after she obtains her bachelor's degree. Perhaps, rather than complaining about the ambitious degree Robyn is pursuing, Father should

focus on being proud and supportive of his intelligent, driven, successful daughter. We find no error on this issue.

# III. Contempt

[17] Finally, Father contends that the trial court erred by denying his motion to have Mother found in contempt of the dissolution decree. The determination of whether a party is in contempt of court is a matter within the sound discretion of the trial court. *Jones v. State*, 847 N.E.2d 190, 199 (Ind. Ct. App. 2006). We will reverse only if the trial court's decision is against the logic and effect of the facts and circumstances before the court or is contrary to law. *Id.*

[18] Generally, a person who willfully disobeys any order lawfully issued by any court of record is guilty of indirect contempt of court. *Davidson v. State*, 836 N.E.2d 1018, 1020 (Ind. Ct. App. 2005). Here, Father argues that Mother has disobeyed the dissolution decree by failing to keep Father informed of Robyn's school and extracurricular activities. He argues that "as a result of a planned, persistent and deliberate pattern of conduct, Mother succeeded in excluding Father from any meaningful participation in Robyn's life as a parent." Appellant's Br. p. 21. He notes that the dissolution decree provides that they were to share joint custody, which implies that they "would share authority and responsibility for the major decisions concerning Robyn's upbringing, including her education, healthcare, and religious training." *Id.*

[19] Initially, the trial court found that "there were several instances where Father was informed of or should have recognized or assumed that Robyn was going

to college." Appellant's App. p. 32. It cited to multiple emails to Father from both Robyn and Mother in the record referring to Robyn's plans to attend college; among other things, Robyn told him about her SAT and ACT scores and referred to the process of filling out college applications.

[20] Furthermore, the trial court noted that, while the dissolution decree refers to joint custody, it neither defined the term nor specifically addressed legal custody. "Moreover, [the dissolution decree does] not specifically impose an obligation on Mother to take those actions which Father alleges Mother failed to take. . . . The Decree was not clear and certain as to either parent's obligation in regard to Father's allegation." *Id.* at 33. Additionally, Father did not take the initiative to ask Mother for the information he complains he failed to receive, nor did he seek judicial relief until she filed the petition asking that he contribute to Robyn's college expenses:

> 10. Father's last request to Mother for Robyn's school information was early in her high school career. Robyn's high school records were available on line and Mother provided the school with Father's contact information and email so as to allow him to obtain all school information directly from the school. The school would email parents of activities, grades, schedules, etc. . . . Father failed to make any inquiries to Mother to request any information about school or activities, notwithstanding that he possessed her telephone number and email address. Further, there is no evidence Mother took any steps to prevent Father from obtaining school information. Father admitted that he did not obtain information directly from the school, although he was permitted to do so . . . . In view of Father having no communication with Mother, making no requests to her for any information about Robyn, and in view of the lack of any in-

person contact or telephone calls between Father and the child after fall 2012, it was reasonable for Mother to assume either that Father had no interest in receiving school or activity information or that he was obtaining such information directly from the school. The Court finds that her failure to provide such information was not willful and, even if it were, it does not constitute a violation of the Decree.

11. Father did not file any petitions regarding custody, parenting time, or education information between [an order clarifying parenting time] entered on January 3, 2008 and the filing of the Contempt on September 15, 2014, nor is there any evidence he contacted Mother in an attempt to resolve any issues related to the allegations which formed the basis of the Contempt during that time period.

*Id.* at 34-35. The trial court found that Father did not prove that Mother intentionally and willfully violated the dissolution decree. It further found that Father was being dishonest about his motives:

The Court inferred from the evidence that the timing of the filing of such Contempt after the child had already graduated from high school demonstrates that Father likely filed such petition as a response to Mother's Petition for Educational Support. The Court further inferred that had Father been interested in obtaining information about Robyn's education and college plans, and in being a part of the process of selecting a college, he would have made an effort in that regard. Failing that, he should have filed his Contempt long before he did. Instead, he sat on his rights and filed the Contempt months after Robyn had graduated from high school.

*Id.* at 37.

Father argues that the trial court erred by focusing on the fact that the term "joint custody" is not defined in the dissolution decree, pointing out that the term is defined by statute. Even if we were to agree with this contention solely for argument's sake, we do not find the trial court's ruling to be erroneous. The trial court cited to a wealth of evidence in the record establishing that Father made little to no effort to seek the information he complains he did not receive. He had the right to get the information from the school; he did not do so. He had the right to ask Mother for the information; he did not. He had the right to seek judicial intervention; he did not (until Mother asked him to help pay for Robyn's college expenses). When Robyn referred to her college application process to him, he showed no curiosity, asking no questions or showing any interest whatsoever in his daughter's post-high school plans. Under these circumstances, we agree that it was reasonable for Mother to assume that he simply had no interest in this information and that her failure to provide it did not constitute a willful violation of the dissolution decree. Therefore, the trial court did not err by denying Father's petition to have her found in contempt.

The judgment of the trial court is affirmed.

Barnes, J., and Crone, J., concur.